# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
### WICHITA DIVISION

State of MONTANA, State of KANSAS, State
of IOWA, State of SOUTH DAKOTA, State of
MISSISSIPPI, State of NEBRASKA, State of
NORTH DAKOTA, State of OKLAHOMA, and
State of SOUTH CAROLINA,

        *Plaintiffs*,

    v.

JOSEPH R. BIDEN, JR., in his official capacity
as President of the United States;
DEPARTMENT OF THE TREASURY; JANET
L. YELLEN, in her official capacity as
Secretary of the Department of the Treasury;
DEPARTMENT OF JUSTICE; MERRICK B.
GARLAND, in his official capacity as the
Attorney General of the United States;
DEPARTMENT OF THE INTERIOR; DEBRA
A. HAALAND, in her official capacity as the
Secretary of the Department of the Interior;
DEPARTMENT OF AGRICULTURE;
THOMAS J. VILSACK, in his official capacity
as the Secretary of the Department of
Agriculture; DEPARTMENT OF LABOR;
JULIE A. SU, in her official capacity as the
Acting Secretary of the Department of Labor;
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; XAVIER BECERRA, in his
official capacity as the Secretary of the
Department of Health and Human Services;
DEPARTMENT OF HOUSING AND URBAN
DEVELOPMENT; ADRIANNE TODMAN, in
her official capacity as the Acting Secretary of
the Department of Housing and Urban
Development; DEPARTMENT OF
EDUCATION; MIGUEL CARDONA, in his
official capacity as the Secretary of the
Department of Education; and the UNITED
STATES OF AMERICA;

        *Defendants*.

Civil Action No. _____

### PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     Congress allocates funds to Cabinet Offices and Agencies to do the work that those parts of the Executive Branch are tasked with.  But President Biden issued an executive order— an order allegedly drafted by a progressive activist group—tasking the whole of government to use those funds in ways that Congress never contemplated—at the risk of violating federal and State laws.

2.     Even worse, Agencies implementing that order seem to be doing so without following *any* of the procedures laid out by Congress.  For example, the U.S. Attorney General is registering imprisoned felons to vote[1]—but there was never notice nor comment on that policy to allow the public to weigh in on whether that is right.  And in many States, felons voting is illegal. Because the U.S. Attorney General failed to follow neutral processes the likelihood of potential conflicts between federal action and State laws is heightened.

3.     The undersigned Attorneys General are all avid supporters of voting rights and voter registration efforts.  But the Biden-Harris Administration must follow the law.  Agencies cannot take money Congress allocated and reuse it for improper purposes.  And they certainly cannot do so without following the laws that establish procedures laid out by Congress.

4.     The relentless federal encroachment on the States' sovereign prerogatives often brings the federal Executive Branch's encroachment on the legislative role that the Constitution leaves entirely to Congress.  U.S. Const. art. I, § 1.

---

[1] *See* Letter from Richard J. Durbin, U.S. Senator, et al., to Merrick Garland, U.S. Attorney General and Ms. Collette Peters, Director, U.S. Bureau of Prisons (Mar. 28, 2024) (noting that under EO 14019 "[h]undreds of individuals inside federal prisons have successfully registered and voted in recent elections" and pushing to "build on the progress BOP has already achieved"), https://perma.cc/7J2S-HFEC.

5.      In addition to that dual encroachment, this suit involves a strike against a core attribute of the States' sovereignty: voting.

6.      Through Executive Order 14019 (EO 14019), 86 Fed. Reg. 13,623, 13,623–27 (Mar. 10, 2021), President Biden has sought to convert the federal bureaucracy into a voter registration organization and to turn every interaction between a federal bureaucrat and a member of the public into a voter registration pitch.  That exceeds any authority executive entities have under federal law, violates the Constitution, threatens States' attempt to regulate voter registration, and thus ultimately undermines the voter registration systems set up by the States.  In doing so, EO 14019 has ramifications not just for federal elections, but also for State elections.  By its terms, EO 14019 would turn the federal bureaucracy into a voter-registration outfit to register voters for *State and local* elections as well as federal elections.

7.      Moreover, it does so in secret.  Agency plans implementing the order—plans that fundamentally alter agency programs—do not go through public notice and comment.  Rather, all an agency does is submit the plan to the White House; nothing else is necessary for the plan to be effective.  Further, in response to requests under the Freedom of Information Act, the Biden-Harris Administration has asserted that the plans are subject to privilege and may be withheld from public scrutiny.  Order, *The Found. for Gov't Accountability v. U.S. Dep't of Justice*, No. 2:22-cv-252 (M.D. Fla. Aug. 25, 2023), ECF No. 67, at 33 ("DOJ next asserts that it properly withheld the Strategic Plan in its entirety pursuant to the presidential communications privilege."); *see also* Michael Watson, *Opinion Column: "A Republic, if you can keep it,"* (Apr. 10, 2024) (plans submitted by agencies are "not public, and the [Biden-Harris Administration] never intended for them to be public"), https://perma.cc/QMZ4-JTTD.  That bald attempt to shield agency action from public scrutiny is the best evidence of their unlawfulness, and is, itself, unlawful.

8.     The States therefore sue to end federal agencies' implementation of the unlawful EO and vindicate their interests in the integrity of their elections, Congress' statutory purpose in regulating voter registration for federal elections, and the "double security" of federalism that the Constitution has established with regards to elections, *Gregory v. Ashcroft*, 501 U.S. 452, 459 (1991) (quoting The Federalist No. 51, at 323 (James Madison) (Clinton Rossiter ed. 1961)).

## JURISDICTION AND VENUE

9.     This Court has subject-matter jurisdiction because the federal claims arise under the Constitution and laws of the United States, *see* 28 U.S.C. § 1331, and because the United States, its agencies, and its officials are defendants, *see* 28 U.S.C. § 1346(a)(2).

10.     Plaintiff States have a cause of action under the APA, 5 U.S.C. § 706, under non-statutory review of *ultra vires* action, and under the Court's inherent equitable power.

11.     Plaintiff States also seek relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

12.     Venue is proper in this District under 5 U.S.C. § 703 and 28 U.S.C. § 1391(e)(1)(B) because many of the events or omissions giving rise to the claim occurred in this District.

13.     Plaintiff States request that a jury trial be held in the Wichita Division of the District of Kansas.

## PARTIES

### I.     Plaintiffs

14.     Plaintiff State of Montana is a sovereign State of the United States of America. Montana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

15.     Austin Knudsen is the Attorney General of Montana.  Attorney General Knudsen is authorized to bring legal actions to protect the interests of the State of Montana and its citizens.

16.    Plaintiff State of Kansas is a sovereign State of the United States of America.  Kansas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

17.    Kris Kobach is the Attorney General of Kansas.  Attorney General Kobach is authorized to bring legal actions to protect the interests of the State of Kansas and its citizens.

18.    Plaintiff Iowa is a sovereign State of the United States of America.  Iowa sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

19.    Iowa brings this suit through its attorney general, Brenna Bird.  She is authorized by Iowa law to sue on the State's behalf under Iowa Code § 13.2.

20.    Plaintiff State of South Dakota is a sovereign State of the United States of America.  South Dakota sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

21.    Marty J. Jackley is the duly elected Attorney General of South Dakota with the authority, per SDCL 1-11-1(1), to prosecute and defend all actions, civil or criminal, in which the state is an interested party.

22.    South Dakota also brings this suit through its secretary of state, Monae L. Johnson, as the chief election official for the State.  She is responsible for providing training and general guidance to county auditors and election officials in implementing and overseeing the administration of State voter registration law and the conduct of elections.

23.    Plaintiff Mississippi is a sovereign State of the United States of America.  Mississippi sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

24.    Mississippi brings this suit through its attorney general, Lynn Fitch.  She is authorized by Mississippi law to sue on the State's behalf under Miss. Code Ann. § 7-5-1.

25.    Mississippi also brings this suit through its secretary of state, Michael Watson, as the chief election official for the State.  He is responsible for providing training and general guidance to county election commissioners and county circuit clerks in overseeing the administration of voter registration and the conduct of elections.

26.    Plaintiff State of Nebraska is a sovereign State of the United States of America. Nebraska sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

27.    Michael T. Hilgers is the duly elected Attorney General of Nebraska.  The Attorney General of Nebraska is authorized to bring legal actions on behalf of the State and its citizens. Neb. Rev. Stat. § 84-203.

28.    Plaintiff State of North Dakota is a sovereign State of the United States of America and sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

29.    Drew Wrigley is the Attorney General of North Dakota and is authorized to "[i]nstitute and prosecute all actions and proceedings in favor or for the use of the state."  N.D.C.C. § 54-12-01(2).

30.    Plaintiff State of Oklahoma is a sovereign State of the United States of America. Oklahoma sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

31.    Gentner Drummond is the duly elected Attorney General for the State of Oklahoma. Being the chief law officer of the state, General Drummond is empowered "[t]o appear for the state and prosecute and defend all actions and proceedings in any of the federal courts in which the state is interested as a party."  Okla. Stat. tit. 74, § 18b(A)(2).

32.    Plaintiff State of South Carolina is a sovereign State of the United States of America.  South Carolina sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

33.     Alan Wilson is the duly elected Attorney General of South Carolina, and he has the authority to sue on behalf of the State of South Carolina.  *State ex rel. Condon v. Hodges*, 562 S.E.2d 623, 627 (S.C. 2002) ("As the chief law officer of the State, [the Attorney General] may, in the absence of some express legislative restriction to the contrary, exercise all such power and authority as public interests may from time to time require, and may institute, conduct and maintain all such suits and proceedings as he deems necessary for the enforcement of the laws of the State, the preservation of order, and the protection of public rights." (citation omitted)).

34.     Together, Montana, Kansas, Iowa, South Dakota, Mississippi, Nebraska, North Dakota, Oklahoma, and South Carolina are the "Plaintiff States."

## II.     Defendants

35.     Defendants are the United States and officials and agencies of the government of Defendant United States of America and are responsible for issuing, implementing, or aiding in implementing of section 3 and section 9 of EO 14019.

36.     Defendant Joseph R. Biden, Jr., is President of the United States.  He issued EO 14019.  He is sued in his official capacity.

37.     Defendant Department of the Treasury ("Treasury") is a Cabinet-level agency within the Government of the United States.

38.     Defendant Janet L. Yellen is the Secretary of the Department of the Treasury.  She is sued in her official capacity.

39.     Defendant Department of Justice ("DOJ") is a Cabinet-level agency within the Government of the United States.

40.     Defendant Merrick B. Garland is the Attorney General.  He is sued in his official capacity.

41.     Defendant Department of the Interior ("DOI") is a Cabinet-level agency within the Government of the United States.

42.     Defendant Debra A. Haaland is the Secretary of the Department of the Interior.  She is sued in her official capacity.

43.     Defendant Department of Agriculture ("USDA") is a Cabinet-level agency within the Government of the United States.

44.     Defendant Thomas J. Vilsack is the Secretary of the Department of Agriculture.  He is sued in his official capacity.

45.     Defendant Department of Labor ("DOL") is a Cabinet-level agency within the Government of the United States.

46.     Defendant Julie A. Su is the Secretary of the Department of Labor.  She is sued in her official capacity.

47.     Defendant Department of Health and Human Services ("HHS") is a Cabinet-level agency within the Government of the United States.

48.     Defendant Xavier Becerra is the Secretary of the Department of Health and Human Services.  He is sued in his official capacity.

49.     Defendant Department of Housing and Urban Development ("HUD") is a Cabinet-level agency within the Government of the United States.

50.     Defendant Adrianne Todman is the Acting Secretary of the Department of Housing and Urban Development.  She is sued in her official capacity.

51.     Defendant Department of Education ("DOE") is a Cabinet-level agency within the Government of the United States.

52.     Defendant Miguel Cardona is the Secretary of the Department of Education.  He is sued in his official capacity.

53.     On information and belief, many other federal agencies are implementing EO 14019.

54.     Together, Defendants are the "Federal Government."

55.     Together, Defendants Treasury, DOJ, DOI, USDA, DOL, HHS, HUD, and DOE and their secretaries/heads are the "Agency Defendants."

## GENERAL ALLEGATIONS

### III.     States' primary role in establishing and regulating voter registration.

56.     Voter registration is the process by which persons who are eligible to vote enroll to vote.  To be qualified to vote, a citizen must be registered to vote.

57.     States have plenary authority to regulate state elections, *see* U.S. Const. amend. X, as modified only by the Fourteenth, Fifteenth, Nineteenth, and Twenty-Sixth Amendments.  Thus, States can establish rules relating to voter registration, including how persons register and who may participate in voter registration activities (including, but not limited to, registering individuals, assisting individuals to register, discussing how individuals may register to vote, and providing information to individuals about registering to vote).

58.     In terms of federal elections, the Constitution vests primary regulatory authority (subject to limited restraints, *see, e.g.*, U.S. Const. amend. XV) in the States.  First, for both the House and the Senate, the Constitution provides that the States determine who may vote for members of both houses.  *See* U.S. Const. art. I, § 2, cl. 2; amend. XVII.  Likewise, States have plenary authority to determine who may vote to elect the President of the United States, *see* art. II, § 1, cl. 2, and so plenary authority to set voter registration rules pertaining to presidential elections as well.

59.     Thus, the States' role in voter registration is paramount.  Voter registration is a qualification to vote.  "Proscribing voting qualifications ... forms no part of the power to be conferred upon the national government by the" Constitution.  *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 16 (2013) (quotations omitted).  And even if voter registration is not a qualification to vote, but a time, place, or manner of holding an election, the *only* non-constitutional limits on the States are those that *Congress* has duly enacted.[2]

60.     For federal elections, Congress has imposed a regulatory superstructure on voter registration by way of the National Voter Registration Act (NVRA).

61.     Assuming the NVRA is constitutional, it "requires States to provide simplified systems for registering to vote in *federal* elections, *i.e.*, elections for federal officials, such as the President, congressional Representatives, and United States Senators." *Young v. Fordice*, 520 U.S. 273, 275 (1997).

62.     Whatever constitutional infirmities infect the NVRA, the law still respects States' preeminent role in voter registration.

63.     For example, the NVRA requires States to designate certain offices as voter registration agencies but leaves the States with significant latitude in doing so.  *See* 52 U.S.C. § 20506(a)(1)–(3), (c).

64.     States must designate offices "that provide public assistance" and those "that provide State-funded programs primarily engaged in providing services to persons with disabilities" as voter registration agencies.  § 20506(a)(2).

---

[2] The States preserve all their arguments that contrary precedent should be overruled.

65.     States must also designate additional offices, but here they have a choice between State and local government offices or "[f]ederal and nongovernmental offices, with the agreement of such offices."  § 20506(a)(3)(A)–(B).

66.     The NVRA also regulates voter registration, such as requiring agencies to register voters in a non-partisan manner, to not discourage a member of the public from registering, or to not suggest that registering or not registering to vote will affect the services or benefits a member of the public will receive.  § 20506(a)(5).

67.     Once an office is a designated voter registration agency, it must distribute "mail voter registration application forms," provide "assistance to applicants in completing voter registration application forms," and accept "completed voter registration application forms for transmittal to the appropriate State election official."  § 20506(a)(4)(A).

68.     Voter registration agencies must—if they "provide[] services[s] or assistance in addition to conducting voter registration"—provide a registration application and a form that tells those receiving services they may register to vote, the fact that choosing not to register will not affect their right to services or assistance, that they may receive help in filling out a voter registration form, and information about how to file a complaint relating to voter registration.  *See* § 20506(a)(6)(A)–(B).

69.     In sum, the NVRA is the main federal law pertaining to federal voter registration. Under it, federal agencies have a narrow role in the voter registration process:  They may engage in voter registration activities only as consistent with the NVRA and only with the permission of the States.

#### IV.     EO 14019's unauthorized authorization for federal agencies to engage in voter-registration activities.

70.     On March 7, 2021, President Biden issued EO 14019, an order meant to do what the President and Congress failed to accomplish via the normal lawmaking process. *See, e.g.*, H.R. 1, 117th Cong. (2021).  EO 14019 is incorporated into this Complaint by reference.

71.     The purpose of the executive order was to further what President Biden said was the federal government's "*duty* to ensure that registering to vote and the act of voting be made simple and easy for all those eligible to do so."  EO 14019, § 1 (emphasis added).

72.     President Biden and the Biden-Harris Administration decided that is not the State's responsibility.  Rather, "[i]t is the responsibility of the Federal Government to expand access to, and education about, voter registration and election information, and to combat misinformation, in order to enable all eligible Americans to participate in our democracy."  EO 14019, § 2.

73.     That statement undermines the assertion that the EO "shall be implemented consistent with applicable law and subject to the availability of appropriations."

74.     Section 3 of EO 14019 implements the order's purpose and policy by directing federal agencies and departments, including those named here, to "consider ways to expand citizens' opportunities to register to vote and to obtain information about, and participate in, the electoral process."

75.     Section 3(a) directs that "[t]he head of each agency shall evaluate ways in which the agency can, as appropriate and consistent with applicable law, promote voter registration and voter participation" by considering:

  a.   "[W]ays to provide relevant information in the course of activities or services that directly engage with the public … about how to register to vote, how to request a vote-by-mail ballot, and how to cast a ballot in upcoming elections;"

b. "[W]ays to facilitate seamless transition from agencies' websites directly to State online voter registration systems or appropriate Federal websites, such as Vote.gov;"

c. "[W]ays to provide access to voter registration services and vote-by-mail ballot applications in the course of activities or services that directly engage with the public, including: (A) distributing voter registration and vote-by-mail ballot application forms, and providing access to applicable State online systems for individuals who can take advantage of those systems; (B) assisting applicants in completing voter registration and vote-by-mail ballot application forms in a manner consistent with all relevant State laws; and (C) soliciting and facilitating approved, nonpartisan third-party organizations and State officials to provide voter registration services on agency premises;"

d. "[W]ays to promote and expand access to multilingual voter registration and election information, and to promote equal participation in the electoral process for all eligible citizens of all backgrounds; and"

e. "[W]hether, consistent with applicable law, any identity documents issued by the agency to members of the public can be issued in a form that satisfies State voter identification laws."

76. Thus, section 3(a) requires nearly *all* federal departments and agencies to engage in many of the same voter registration activities that the NVRA covers.

77. Section 3(b) directs the federal agencies to "submit to the Assistant to the President for Domestic Policy a strategic plan outlining the ways identified under this review that the agency

can promote voter registration and voter participation" as outlined in section 3(a) within 200 days of the date of EO 14019, *i.e.*, by September 23, 2021.

78.     On information and belief, the 200-day deadline is not strict.  Agencies have submitted plans past that deadline, and those plans are still effective and considered authorized by EO 14019.  For example, the White House published two fact sheets detailing agency action taken under EO 14019, including section 3.  One fact sheet was published in September 2021.  *See Fact Sheet: Biden Administration Promotes Voter Participation with New Agency Steps* (Sept. 28, 2021) ("*September Fact Sheet*").[3]  The other was published in December 2021—significantly past the 200-day deadline.  *See Fact Sheet: The Biden-Harris Administration Is Taking Action to Restore and Strengthen American Democracy* (Dec. 8, 2021) ("*December Fact Sheet*").[4]  Further actions were listed in a fact sheet the White House published in March 2023.  *See Fact Sheet: The Biden-Harris Administration Continues to Promote Access to Voting* (March 5, 2023) ("*March Fact Sheet*").[5]

79.     Section 3 does not differentiate between State or federal elections.  Thus, EO 14019 authorizes and requires federal agencies to engage in voter registration activities for state elections as well as federal elections.

80.     Section 4's reference to the NVRA confirms that reading.  The express reference and discussion of the NVRA, which deals only with federal elections, *see* 52 U.S.C. § 20506(a)(1),

---

[3]  *Available at* https://www.whitehouse.gov/briefing-room/statements-releases/2021/09/28/fact-sheet-biden-administration-promotes-voter-participation-with-new-agency-steps/.

[4]  *Available at* https://www.whitehouse.gov/briefing-room/statements-releases/2021/12/08/fact-sheet-the-biden-harris-administration-is-taking-action-to-restore-and-strengthen-american-de-mocracy/.

[5]  *Available at* https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/05/fact-sheet-the-biden-harris-administration-continues-to-promote-access-to-voting/.

contrasts strongly with the lack of such a reference in section 3 of EO 14019.  It says that section 3 directs that federal agencies engage in voter registration activities for state and federal elections.

81.     Section 9 of EO 14019 directs the Attorney General to establish procedures to ensure that convicted criminals in U.S. custody, or those who are about to leave custody, are registered to vote.

82.     EO 14019 thus accomplishes two things:

a.  First, it directs the federal bureaucracy to engage in voter registration activities of the type normally performed by state or local entities or private organizations.  That is, it directs federal agencies, in addition to their primary mission, to register voters directly or by working through third parties.

b.  Second, EO 14019 directs the federal bureaucracy to set up its voter registration processes outside the usual procedural processes that allow interested parties, including Plaintiff States, to provide input into agency action.

83.     But what EO 14019 does not do is identify a congressional law that authorizes the President to use federal departments and agencies to engage in voter registration drives.

84.     Instead, EO 14019 emerges from left-wing advocacy groups and thus the policy concerns flagged in the text of the order do not provide the whole motivation for the order.

85.     Dēmos, for example, claimed credit for EO 14019.  @Demos.org, X (formerly Twitter) (Mar. 7, 2021, 12:24 PM), https://twitter.com/Demos_Org/status/1368613436318511109.  And Dēmos prides itself on "mov[ing] progressive issues from the movement to the mainstream."  *About Dēmos*, Dēmos, https://www.demos.org/about (last visited July 25, 2024).

86.     The left-wing push behind EO 14019 has continued through the order's implemen-tation.  Dēmos, for example, monitors implementation and advocates that federal agencies do more to implement EO 14019.  *See* Ashley Tjhung, *Expanding Voter Registration: Reflections on the Voting Access Executive Order*, Dēmos (Mar. 7, 2024).[6]

## V.     Federal agencies implement EO 14019.

87.     After the President issued EO 14019, federal agencies—consistent with his direc-tives in the order—implemented it.

88.     Consistent with section 3(b), agencies did not provide the public with notice and an opportunity to comment on those plans.  Rather, each agency created their plans internally and then transmitted them to the Assistant to the President for Domestic Policy.

89.     On information and belief, each plan was effective upon transmittal.  The White House, for example, called them "commitments."  *September Fact Sheet*, *supra*.

90.     DOJ has implemented parts of section 9 of EO 14019 without engaging in notice-and-comment.

91.     Thus, the public has learned how agencies have implemented EO 14019 through press releases or agency statements located only on agency websites—if the public learns about them at all.  That includes actions by many of the Agency Defendants:

92.     **Department of the Treasury:**  Per the *September Fact Sheet*, Treasury said it would implement EO 14019 by including "information about registration and voter participation in its direct deposit campaigns for Americans who receive Social Security, Veterans Affairs, and other federal benefit payments."

---

[6] *Available at* https://www.demos.org/blog/expanding-voter-registration-reflections-voting-ac-cess-executive-order.

93.     The Internal Revenue Service (IRS), a sub-agency of Treasury, through the Stake-holder Partnerships, Education and Communication (SPEC) now encourages "SPEC Partners to provide [voter registration] information to taxpayers at their local VITA/TCE sites either during the filing season or throughout the year."  IRS, *Guidance for Promoting Registration at VITA/TCA Sites* (June 2022A), https://www.irs.gov/pub/irs-pdf/p5665.pdf ("IRS VITA Guidance").

94.     "The IRS's Volunteer Income Tax Assistance (VITA) and Tax Counseling for the Elderly (TCE) programs offer free basic tax return preparation to" low-income and elderly taxpay-ers.  IRS, *Free Tax Return Preparation for Qualifying Taxpayers* (last visited Aug. 1, 2022), https://www.irs.gov/individuals/free-tax-return-preparation-for-qualifying-taxpayers.   The pro-gram enlists organizations, called "partners" that can be "corporate, faith-based, nonprofit, educa-tional, financial and government[al]" organizations, to provide tax services for free.  IRS, *Become an IRS Partner to Help in Your Community* (last visited Aug. 1, 2022), https://www.irs.gov/indi-viduals/become-an-irs-partner-to-help-in-your-community.   Each VITA/TCE partner receives help from the IRS.  *See* IRS VITA Guidance, *supra* (section "How Will Territories Assist Part-ners").

95.     The IRS has made many changes to accommodate partners who wish to engage in voter registration activities.  For example, the agency will provide them assistance with voter reg-istration activities, *see* IRS VITA Guidance (discussing how Territories will assist partners), im-pose duties on those set run sites that provide tax filing services who choose to provide voter registration services, *see id.* (discussing SPEC Site Coordinators/Facilitators' responsibilities), and changed the form the IRS provides to coordinators/facilitators to have coordinators/facilitators check a box to say they provide voter registration services, *see id.*

96.     Furthermore, the IRS VITA Guidance makes explicit that EO 14019 applies to registration for state *and* federal elections.   In a section entitled "Voting Registration Educational Websites," the IRS lists a website (usvotefoundation.org) that "has useful voter information including: ... Upcoming state election dates and deadlines."

97.     In 2023, the IRS expanded its implementation of EO 14019.   It provided "voter registration in the instructions for IRS Form 1040 and in direct mail pieces delivered to approximately 900,000 Americans who receive Social Security Benefits, Railroad Pension benefits, and federal retirement benefits." *March Fact Sheet*, *supra*.

98.     **Department of Justice:**  DOJ appears to have taken a number of steps to administer sections 3 and 9 and EO 14019.

99.     As relevant here, "[t]he Department will ... provide information about voting to individuals in federal custody, facilitate voting by those who remain eligible to do so while in federal custody, and educate individuals before reentry about voting rules and voting rights in their states." *September Fact Sheet*, *supra*.

100.     On information and belief, DOJ is providing voter registration services to those in federal custody consistent with section 9 of EO 14019.   Attorney General Garland, in a speech he gave on June 11, 2021, said, "Under the supervision of the Deputy and Associate Attorneys General, the department will implement its responsibility under Presidential Executive Order 14019, *Promoting Access to Voting*.   Those include ensuring access to voter registration for eligible individuals in federal custody."   Attorney General Merrick B. Garland, *Attorney General Merrick B. Garland Delivered a Policy Address Regarding Voting Rights* (June 11, 2021).   And by March 2023, DOJ was "promoting access to voting for those who remain eligible to vote while in federal custody, including by putting in place procedures to facilitate voter registration and voting."

*March Fact Sheet*, *supra*; *see also supra* note 1 (letter from Senate Democrats to Attorney General Garland and BOP Director Peters complimenting their efforts to register those in federal custody to vote and pushing them to "build on the progress BOP has already achieved").

101.   **Department of Interior:**   According to the *September Fact Sheet*, "The Department of the Interior will disseminate information on registering and voting, including through on-site events, at schools operated by the Bureau of Indian Education and Tribal Colleges and Universities, serving about 30,000 students.  The Department will also, where possible, offer Tribal College and University campuses for designation by states as voter registration agencies under the National Voter Registration Act."

102.   "Additionally, because federal public lands are one of the most common touch points between the federal government and the American people, the Department will explore options to expand access to voter registration on public lands across the country."  *March Fact Sheet*, *supra*.

103.   **Department of Agriculture:**   The *September Fact Sheet* says that USDA's Rural Housing Service "will encourage the provision of nonpartisan voter information through its borrowers and guaranteed lenders," and it says that Rural Development agencies—"which are spread throughout field offices across the country where rural Americans can apply for housing, facilities, or business assistance—will take steps to promote access to voter registration forms and other pertinent nonpartisan election information among their patrons."

104.   In March 2022, a separate USDA policy memo, applying "to State agencies implementing, and local organizations operating, the Child Nutrition Programs," "encourage[d] all state agencies administering the child nutrition programs to provide local program operators with pro-

motional materials, including voter registration and non-partisan, non-campaign election infor-mation, to disseminate among voting-age program participants and their families."  FNS SP 07-2022, CAFP 06-2022, SFSP 02-2022, *Promoting Access to Voting Through the Child Nutrition Programs* (USDA 2022).

105.    On information and belief, USDA provided more information in non-public com-munication.  For example, a letter from many members of the House of Representatives reported that USDA sent letters to State entities that said "the cost of providing voter registration services, including application processes and training for staff, are allowable SNAP administrative expenses and are reimbursed at the 50 percent level."  Letter from House Members to Secretary Vilsack, at 1–2 (June 15, 2022) ("Vilsack Ltr.").[7]

106.    **Department of Labor:**  Per the *September Fact Sheet*, "[t]he Department of Labor will issue guidance encouraging states to designate the more than 2,400 American Job Centers, which provide employment, training, and career services to workers in every state, as voter regis-tration agencies under the National Voter Registration Act. … The Department will also provide guidance that grantees can use federal workforce development funding, where consistent with pro-gram authority, to conduct nonpartisan voter registration efforts with participants."

107.    As part of its plan, DOL told grantees when they could "use federal workforce de-velopment funding, where consistent with program authority, to conduct nonpartisan voter regis-tration efforts with participants."  *Id.*  DOL said six programs—the Workforce Innovation and Opportunity Act Title I Youth Program, YouthBuild, Indian and Native American Program, Na-tional Farmworker Jobs Program, Reentry Employment Opportunities, and Job Corps—"can carry

---

[7]  *Available at*  https://mcusercontent.com/67fba463240fdd948eb636b35/files/c5468331-6d66-f602-530c-a30ca41565ff/20220615_usda_votingeo_1_.pdf.

out certain activities that support voter registration, such as distributing voter registration application forms or directing individuals to such forms online, assisting applicants in completing voter registration forms, and where permissible by state or local election laws, accepting completed voter registration forms for transmittal to the appropriate state election official."  U.S. Dep't of Labor, Emp't & Training Admin., Guidance Letter No. 08-21, at 6–7 (Mar. 25, 2022).

108.   **Department of Health and Human Services:**  Per the *September Fact Sheet*, HHS "will offer its patients [served by the Indian Health Service] assistance with voter registration." *See also December Fact Sheet*, *supra*.

109.   This action is directed at "patients" in Indian health Service facilities; that is, the sick.  *March Fact Sheet*, *supra*.

110.   **Department of Housing and Urban Development:**  Per the *September Fact Sheet*, "The Department of Housing and Urban Development will communicate with public housing authorities (PHAs)—more than 3000 authorities, managing approximately 1.2 million public housing units—through a letter to Executive Directors that provides useful information to PHAs about permissible ways to inform residents of non-partisan voter registration information and services. HUD will also assist relevant HUD-funded service providers by highlighting and sharing promising practices that improve non-partisan voting registration and voting access for people experiencing homelessness."

111.   On information and belief, execution of that plan involved at least two announcements/letters HUD sent to certain public housing authorities.

112.   One announcement, sent from the Office of Multifamily Housing Programs to "multifamily owners/agents of HUD-assisted properties," cited the NVRA and "ask[ed] owners to share voter and election resources with residents."  HUD, *Voting Rights and Access for Residents*

*at HUD-Assisted Properties* (last visited July 24, 2024) ("HUD Multifamily Announcement").[8] But the rest of the letter did not differentiate between state and federal elections, thus indicating that the letter approves activities related to both.

113.     Furthermore, after telling owners to "check with their counsel to ensure that all activities are compliant with local and state law," HUD said that owners could allow "Multifamily-assisted properties" (1) "to hold meetings, candidate forums, or voter registration" on a non-partisan basis and for equal fees and (2) use the space "for voter drop boxes and voting sites, including for early voting." *Id.*

114.     HUD sent a second letter from the Office of Public and Indian Housing to share "information on activities PHAs may engage in to ensure that public housing residents and Section 8 participants have access to" the right to vote.  Letter from Office of Pub. & Indian Housing to Executive Director (Feb. 9, 2022) ("PHA Letter").[9]

115.     Those activities include "[m]aking voter registration resources available to residents," even if not designated as a voter registration agency under the NVRA.  In such cases, HUD said, the PHA could—if consistent with relevant state law—accept and transmit completed voter registration applications or run "a PHA-initiated voter registration drive."

116.     The letter also said that allowing "the use of PHA community space" for certain election related activities, including voter registration, was permissible on a nonpartisan basis, as was using "PHA space for voter drop boxes and voting sites, including for early voting."

117.     For the activities the letter approves, HUD says "PHAs may use" funds related to operating the public housing to defray the cost of such activities.

---

[8] *Available at* https://www.hud.gov/sites/dfiles/PIH/documents/AllVotingCommunications.pdf.

[9] *Available at* https://www.hud.gov/sites/dfiles/PIH/documents/PIH_announcement020922.pdf.

118.   **<u>Department of Education:</u>**   Per the *September Fact Sheet*, "[t]he Department [of Education] will … remind educational institutions of their existing obligation and encourage institutions to identify further opportunities to assist eligible students with voter registration."

119.   In April 2022, DOE issued a "Dear Colleague" letter discussing ways postsecondary institutions could aid students with voter registration.  DOE stated that Federal Work Study funds "may be used to support voter registration activities."  Dear Colleague Letter, U.S. Dep't of Educ. 1 (Apr. 21, 2022) ("EO 14019 Dear Colleague Ltr.").[10]   Those funds can "compensate a student for FWS employment involving voter registration activities" if the "student is employed directly by a postsecondary institution;" they cannot be so used if the student works for a third party, the letter said.  *Id.*

120.   More broadly, DOE is "encourage[ing] colleges and career schools to make good-faith efforts to register students to vote."  *March Fact Sheet, supra.*

121.   And DOE has linked its student loan page "to voter registrations services by linking to vote.gov."  *Id.*

\* \* \*

122.   Thus, numerous agencies have implemented EO 14019, engaging in actions that seek to insert the federal bureaucracy into state electoral systems and the voter registration process. These activities occur across the country, including in Plaintiff States.

123.   Furthermore, on information and belief, other agencies besides the Agency Defendants have created plans to implement EO 14019.

---

[10]   *Available at* https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2022-04-21/requirements-distribution-voter-registration-forms.

124.    Furthermore, on information and belief, the plans that are public are incomplete. For example, section 3(a)(iii)(C) of EO 14019 encourages agencies to solicit and facilitate "approved, nonpartisan third-party organizations … to provide voter registration services on agency premises."  Yet there is little detail about how agencies determine whether a third-party organization is "approved," "nonpartisan," or what third-party organizations an agency can work with to promote voter registration.

125.    The difficulty in determining what agencies are doing to implement EO 14019 is expected and deliberately built into the system, as section 3 of EO 14019 directs agencies to send their final plans to the Assistant to the President for Domestic Policy rather than engage in public notice-and-comment rulemaking or otherwise making the information public.

## VI.    Harms from EO 14019

126.    The States suffer many harms traceable to EO 14019 and federal agencies' implementation of it.  Those harms include pocketbook injuries, procedural harms, and harms to the States' sovereign interests.  *See supra*.

127.    Those harms would be redressed by declaring EO 14019 unlawful in whole or in part; declaring that agency actions taken to implement the order are unlawful, arbitrary and capricious, and should be set aside; and enjoining those actions and others from implementing EO 14019.

### A.    Monetary harms

128.    Many State entities face the prospect of monetary harms through the Agency Defendants' implementation of EO 14019.

129.    For example, DOE is "encourag[ing] colleges and career schools to make good-faith efforts to register students to vote."  *March Fact Sheet*, *supra*.  This requirement is, per DOE,

linked to the Higher Education Act of 1965, specifically its requirement that eligible institutions "make a good faith effort to distribute a mail voter registration form, requested and received from the State to each student enrolled in a degree or certificate program and physically in attendance at the institution, and to make such forms widely available to students at the institution." EO 14019 Dear Colleague Ltr., *supra* (quoting § 487(a)(23) of the Higher Education Act). Thus, DOE is connecting voter-registration requirements with the federal benefit of participating "in the Federal student aid programs." *Id.* The result will be either to force schools to expend resources, including funds, on voter registration efforts or put their federal benefits at risk.

130.    State schools, including schools in Plaintiff States, participate in the Federal student aid programs set up under the Higher Education Act. *See* Dep't of Educ., *2024-2025 Federal School Code List – 3rd Quarter* (May 1, 2024) (providing the list of schools participating in the federal student aid programs).[11]  Plaintiffs States can sue for those financial harms. *See, e.g.*, *Biden v. Nebraska*, 143 S. Ct. 2355, 2365–68 (2023).

131.    On information and belief, there are more plans that operate similarly.

132.    Furthermore, EO 14019 will affect on Plaintiff States' ability to regulate voter registration and their regulations—to the extent of imposing sovereign harms, as detailed below. But for the same reasons, EO 14019 will require States to divert significant resources to enforcing their voter registration and election laws. That is, EO 14019 essentially creates an ungovernable voter-registration machine: the federal bureaucracy. To accommodate for that fact, Plaintiff States will have to divert significant resources from other core operations to ensure efficacious enforcement of their regulations. Thus, EO 14019 "directly affect[s] and interfere[s] with" a "core" activity of

---

[11]    *Available    at*    https://fsapartners.ed.gov/knowledge-center/library/federal-school-code-lists/2024-05-01/2024-25-federal-school-code-list-participating-schools-may-2024.

Plaintiff States—creating voter registration laws and election codes and enforcing them—and is thus a cognizable harm. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

**B.     Procedural harms**

133.    EO 14019 permits agencies to implement their voter registration plans without public notice-and-comment. Thus, Plaintiff States have been injured by the loss of the opportunity to participate in notice-and-comment procedures, which would have helped protect their monetary and sovereign interests by ensuring that the agencies implementing EO 14019 treated those interests fairly and transparently and gave them due consideration.

**C.     Harms to the States' sovereign interests**

134.    Then there are harms to the States' sovereign interests.

135.    There are harms to the States' sovereign right to regulate voter registration and the electoral process—areas the Constitution reserves to the States to regulate with few, well delineated exceptions.

136.    The Tenth Amendment guarantees the States' authority to regulate state elections and voter qualifications, including voter registration for state elections. There can be no doubt that this is a sovereign interest.

137.    When it comes to federal elections, the Constitution vests in the States the power to establish voter qualifications and to regulate the time, place, and manner of elections subject to contrary congressional commands. Those are inherently sovereign acts. *See Smiley v. Holm*, 285 U.S. 355, 366 (1932) ("The primary question now before the Court is whether the function contemplated by article 1, § 4, is that of making laws. Consideration of the subject-matter and of the terms of the provision requires affirmative answer."); *see also Inter Tribal Council*, 570 U.S. at 16 (quotations omitted). More than that, it mandates it. "Legislatures must 'provide a complete

code for'" federal elections, "including regulations 'relating to ... registration ... .'" *Moore v. Harper*, 600 U.S. 1, 29 (2023) (alterations omitted) (quoting *Smiley*, 285 U.S. at 366). "By fulfilling their constitutional duty to craft rules governing federal elections, state legislatures ... make laws." *Id.*

138.    Thus, the power to regulate voter registration is a sovereign right that the Constitution reserves, with few constraints, to the States. *See* U.S. Const. art. I, § 4, cl.1.

139.    That is a core aspect of sovereignty. Regulating elections generally, and voter registration specifically, is part of the States' authority "to determine the qualifications of their most important government officials," and so involves "an authority that lies at the heart of representative government." *Gregory*, 501 U.S. at 463 (quotations omitted).

140.    Thus, the ability to regulate, and regulate in the manner of their choosing, is a sovereign right that Plaintiff States possess and that the Constitution protects.

141.    Federal agencies are not like other entities that normally engage in voter registration activities like state and local entities or private parties. A rule that permits federal agencies to engage in voter registration activities trenches on States' constitutionally protected sovereign rights.

142.    For one, federal agencies and employees engaged in voter registration activities as part of their official duties can remove any case a State brings to enforce State voter registration rules to federal court. *See* 28 U.S.C. § 1442(a)(1). That impairs the States' interest in vindicating their laws in the forums of their choice and limits the ability of State courts to address those issues. Both are sovereign harms in their own right. In the electoral context, that also infringes on Plaintiff States' sovereign interest in regulating elections in the manner of their own choosing.

143.   For another, the vast resources of the federal government render it unique among all possible entities engaged in voter registration.  Because of the resources it can bring to bear, the federal government can engage in voter registration activities on a scale that will, as a practical matter, swamp any State's attempt to regulate the government's actions.

144.   The result fully undermines the regulatory structures Plaintiffs States have created as a practical matter.  Again, that infringes on Plaintiff States' sovereign interest in regulating elections in the manner of their own choosing.

145.   And that assumes the States can regulate federal employees engaged in voter registration activities.  *See North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion) (discussing intergovernmental immunity).  Creating an army of potentially immune voter registration agents harms the States' sovereign interest in creating and regulating elections and voter qualifications.

146.   Thus, EO 14019 will predictably lead to changes in how States regulate voter registration to respond to the federal government's extensive voter registration activities.  Having to change their legal codes in response to unlawful activity that would otherwise swamp or exist outside the States' voter-registration regulations is a cognizable harm.

147.   In sum, the existence of federally sanctioned, federally run voter registration operations infringes on Plaintiffs States' ability to regulate their own electoral processes and set qualifications for electors.  Underlying EO 14019 is the claim that the federal government can run a voter operation with its immense resources, and then answer for the activities of its employees in that operation in the forum of its own choosing—assuming that it must answer for its activities at all.  In doing so, the federal government becomes, in essence, an unregulated—or, at best, a lesser regulated—player in the state electoral process.

148.    "States have a sovereign interest in the power to create and enforce a legal code. Pursuant to that interest, states may have standing based on ... federal assertions of authority to regulate matters they believe they control ... and ... federal interference with the enforcement of state law." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) (quotations and footnotes omitted), *aff'd by an equally divided court*, 579 U.S. 547 (2016).   EO 14019 does just that, and Plaintiff States thus have standing.

149.    On a more fundamental level, EO 14019 strikes at the most basic element of sovereignty: Plaintiff States' interests in "the definition of [their] political community." *Bluman v. FEC*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (Kavanaugh, J.) (three-judge district court).   That interest is sufficient to limit "the participation of" entities, like the federal government, "in the activities of ... democratic self-government" in order to prevent "foreign"—*i.e.*, non-State—influence over the ... political process." *Id.*

150.    Federal action that thrusts federal entities in the state electoral process, including by engaging in voter registration, harms that interest and so is only permissible where congressionally authorized.   EO 14019 is not.

## **CLAIMS FOR RELIEF**

### **COUNT ONE**
### **APA Claim – Substantive Violation, Unlawful Agency Action**
### **Agency Defendants**

151.    All foregoing Paragraphs are incorporated as if set forth fully herein.

152.    The plans the Agency Defendants provided under EO 14019 constitute final agency action and cover all agency actions to implement the order.

153.    The APA authorizes courts to hold unlawful and set aside final agency action that is "contrary to constitutional right, power, or privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."   5 U.S.C. § 706(2)(B), (C).

154.    "[A]n agency literally has no power to act ... unless and until Congress confers power upon it."  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

155.    Agency action taken under EO 14019 is unlawful because there is no Act of Congress giving agencies authority to engage in voter registration activities, as EO 14019 does.

156.    On information and belief, the plans the Agency Defendants created in compliance with EO 14019 do not comply with the NVRA.

157.    Thus, the actions the Agency Defendants did to comply with EO 14019 must be declared unlawful, enjoined, and set aside.

## COUNT TWO
### APA Claim – Substantive Violation, Unconstitutional Agency Action
### Agency Defendants

158.    All foregoing Paragraphs are incorporated as if set forth fully herein.

159.    The actions Agency Defendants have taken to implement EO 14019 constitute final agency action.

160.    The APA authorizes courts to hold unlawful and set aside final agency action that is "contrary to constitutional right, power, or privilege, or immunity" or is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(B), (C).

161.    Agency actions taken to implement EO 14019 are unconstitutional.

162.    *First*, those actions violate the "Qualification Clauses"—that is, provisions of Article I, § 2, cl. 1; Article II, § 1, cl. 2, and the Seventeenth Amendment that vest in the States plenary authority over voter registration and the process of voter registration.

163.    That is because voter registration, and the process of voter registration, is part of the qualification of electors for federal elections.

164.    When federal agencies engage in voter registration activities, they effectively thwart—or, at the very least, lessen the efficacy of—State oversight over the voter registration

30

process.  They therefore constitute a de facto federal regulatory scheme for voter registration apart from State regulations.

165.    That is unconstitutional.

166.    "Congress"—and, by extension, the executive, "has no role in setting voter qualifications, or determining whether they are satisfied, aside from the powers conferred by the Fourteenth, Fifteenth, Nineteenth, Twenty–Fourth, and Twenty–Sixth Amendments, which are not at issue here." *Inter Tribal Council*, 570 U.S. at 26 (Thomas, J., dissenting); *see also id.* at 16–17 & n.9 (opinion for the Court) (acknowledging that fact and noting the constitutional concerns that would arise from federal actions that degrade States' abilities to enforce their voter qualification laws).

167.    To the extent appellate courts have said otherwise, those statements are dicta.  To the extent those statements are holdings, those holdings are wrong and should be overruled.

168.    *Second*, even if voter registration activities are part of the "time, place, and manner of holding elections," and so fall under the Elections Clause, Article I, § 4, clause 1, agency actions implementing EO 14019 are still unconstitutional.

169.    That is because the Elections Clause provides that unless Congress dictates otherwise—and only to the extent it dictates otherwise—States can regulate voter registration.  *See* U.S. Const., art. I, § 4.

170.    Almost without exception, the NVRA is the method by which Congress dictated the limited extent to which federal agencies may engage in voter registration activities, like the ones federal agencies—including Agency Defendants—are doing to implement EO 14019.

171.    But on information and belief, the plans federal agencies—including Agency Defendants—created to comply with EO 14019 do not comply with the NVRA.

172.    When federal agencies engage in voter registration activities, they effectively thwart—or, at the very least, lessen the efficacy of—State oversight over the voter registration process.

173.    The plans implementing EO 14019 do just that; indeed, they constitute a *de facto* federal regulatory scheme for voter registration apart from State regulations.  And since they are a scheme that Congress did not implement, they are unlawful and unconstitutional.

174.    *Third*, agency actions taken to implement EO 14019 violate the Tenth Amendment.

175.    Under the Tenth Amendment, regulation of state elections—including voter regis-tration—is left to the States.

176.    Federal agencies that engage in voter registration activities in the States trench on that interest.

177.    For those reasons, agency action to implement EO 14019 must be declared uncon-stitutional, enjoined, and set aside.

## COUNT THREE
### APA Claim – Substantive Violation, Arbitrary & Capricious Agency Action
### Agency Defendants

178.    All foregoing Paragraphs are incorporated as if set forth fully herein.

179.    The actions Agency Defendants have taken to implement EO 14019 constitute final agency action.

180.    The APA authorizes courts to hold unlawful and set aside final agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

181.    "[A]n agency rule [is] arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

182.    On information and belief, agency actions implementing sections 3 and 9 of EO 14019 suffer from systemic, and common, failures to engage in reasoned decisionmaking because, among other reasons:

a.    They failed to consider the lawfulness of EO 14019 or of the actions that the order requires, both in terms of statutory authority and constitutionality.

b.    They failed to consider the costs that States, including Plaintiff States, shoulder to register voters, maintain voter registration lists, and comply with federal registration laws.

c.    They failed to consider the States' reliance interest.  In particular, the States have relied on the federal government engaging in voter registration activities only by cooperating with the States.  That cooperative paradigm has informed States' regulation of voter registration.  On information and belief, no Agency Defendant considered those interests in creating plans to implement EO 14019.

d.    They failed to consider how their plans intersect with State voter-registration laws and regulations, and so ignored those laws or ensure compliance with them.

e.    They failed to consider how to work with third parties to engage in voter registration activities without violating 31 U.S.C. § 1342.

f.    They failed to consider the risk of fraud or to implement actions to prevent fraud, which threatens the integrity of state administration of elections.  This includes, at a minimum, ensuring that illegal aliens do not register to vote through the plans the Agency Defendants put in place to implement EO 14019.

g.  They failed to consider the fact that linking voter-registration activities or material to federal benefits would pressure recipients of those benefits to either participate in those activities or register to vote.  That failure means Agency Defendants acted arbitrary and capriciously as well as unlawfully—or at least failed to consider the substantive lawfulness of such pressure under the NVRA and Tenth Amendment.  Examples of this failure include, but are not limited to, DOE's EO 14019 Dear Colleague Letter; USDA's use of loan offices to push voter registration material onto lenders; Indian Health Service's providing voter registration material to patients in need of healthcare; and the IRS providing voter registration services "to individuals who seek tax assistance" and welfare recipients, *March Fact Sheet*, *supra*.  In each case, the agencies create the appearance—even if unintended—that acquiescence to the voter registration activity is a condition of receiving the benefit.

183.   Moreover, EO 14019 was motivated by a partisan desire to unfairly increase the Democrat vote, as shown by the fact the order came from left-wing, progressive advocacy groups like Dēmos.  That motivation infects agency action done under the order, and an agency action taken to obtain partisan advantage in an election does not pursue a permissible objective.  *See Level the Playing Field v. FEC*, 961 F.3d 462, 464 (D.C. Cir. 2020) ("[D]ecisions featuring unjustifiable bias or partisanship are precisely the types of agency actions" that are arbitrary and capricious.).

184.   Indeed, the partisan infection is so severe as to render EO 14019, and the agency decisions stemming from it, the product of pretext.  That is, rather than ensure "that registering to vote and the act of voting be made simple and easy for all those eligible to do so," or promoting

or defending "the right to vote for all Americans who are legally entitled to participate in elections," or expanding access and providing education about "voter registration and election information," *see* EO 14019 §§ 1, 2, the purpose is to promote left-wing politicians and policies at elections.  If there are "contrived reasons" instead of "genuine justifications for important decisions," agency action must be set aside.  *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

185.    For those reasons, Agency Defendants' actions implementing EO 14019 are arbitrary and capricious and should be declared unlawful, enjoined, and set aside.

**COUNT FOUR**
**APA Claim – Procedural Violation**
**Agency Defendants**

186.    All foregoing Paragraphs are incorporated as if set forth fully herein.

187.    The actions Agency Defendants have taken to implement EO 14019 constitute final agency action.

188.    The APA authorizes courts to hold unlawful and set aside final agency action that is done "without observance of the procedure required by law."  5 U.S.C. § 706(2)(C).

189.    Any agency decision that it would provide voter registration services, outside of accepting State designations under the NVRA, is a substantive rule that needs to go through notice-and-comment.

190.    On information and belief, numerous federal agencies—including the Agency Defendants—are implementing EO 14019 by engaging in voter registration activities and have made those decisions without engaging in notice-and-comment.

191.    On information and belief, many actions agencies taken under EO 14019 constitute reversals of agency positions or amends regulations.  Those actions needed to have been done via public notice-and-comment procedures, but they were not.

192. As a result, those actions must be declared unlawful, enjoined, and set aside.

**COUNT FIVE**
**Violation of the Tenth Amendment**
**All Defendants**

193. All foregoing Paragraphs are incorporated as if set forth fully herein.

194. Under the Tenth Amendment, regulation of state elections—including voter registration—is left to the States.

195. Federal agencies that engage in voter registration activities in the States trench on that interest.

196. EO 14019 violates the Tenth Amendment by purporting to authorize federal agencies to engage in voter registration activities that relate to state elections, including in Plaintiff States.

197. To the extent the Agency Defendants have conditioned federal benefits on State recipients complying with voter registration activities done under EO 14019, those actions constitute an unconstitutional condition on federal funds and thus an unconstitutional limit on the States' sovereign prerogatives.  The result violates the Spending Clause, art. I, § 8, cl. 1, and the Tenth Amendment.

198. This Court has inherent authority to declare, enjoin, restrain, enter judgment, and impose penalties on Defendants and other federal actors, and those acting in concert with them, to prevent and restrain violations of law, including the Tenth Amendment.

**COUNT SIX**
***Ultra Vires* Presidential action**
**All Defendants**

199. All foregoing Paragraphs are incorporated as if set forth fully herein.

200.     Executive orders issued by a President can be challenged as ultra vires when no statute authorizes the President's action, and where the executive order does not rest on the President's inherent constitutional powers.  *See*, *e.g.*, *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996).

201.     There was no legal authority for President Biden to issue the EO.  No provision of the Constitution grants him such power.  Neither does the NVRA or any other federal statute grant him such power.

202.     This Court has inherent authority to declare, enjoin, restrain, enter judgment, and impose penalties on Defendants and other federal actors, and those acting in concert with them, to prevent and restrain violations of law, including for *ultra vires* actions.

**COUNT SEVEN**
*Ultra Vires* **Action – Agency Creation of Substantive Rules Outside Proper Processes**
**All Defendants**

203.     All foregoing Paragraphs are incorporated as if set forth fully herein.

204.     "The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer (Steel Seizure Case)*, 343 U.S. 579, 585 (1952).

205.     "[W]hen the President acts in contravention of the will of Congress, 'his power is at its lowest ebb,' and the Court can sustain his actions 'only by disabling the Congress from acting upon the subject.'"  *Dames & Moore v. Regan*, 453 U.S. 654, 669 (1981) (quoting *Steel Seizure Case*, 343 U.S. at 637–38 (Jackson, J., concurring)).

206.     EO 14019 permits Agency Defendants to implement substantive rules that, under the APA, need to go through notice-and-comment.  *See* 5 U.S.C. § 553.

207.     Many agency actions implementing those sections of EO 14019 are substantive agency rules that needed to go through notice-and-comment.  For example, USDA issued rules

under EO 14019 that said Rural Development agencies "*will* take steps to promote access to voter registration forms and other pertinent nonpartisan election information among their patrons." *September Fact Sheet*, *supra* (emphasis added).  And the USDA has told state entities that "the cost of providing voter registration services, including application processes and training for staff, are allowable SNAP administrative expenses and are reimbursed at the 50 percent level."  Vilsack Ltr., *supra*, at 1–2.  Similarly, HHS said it "will offer its patients [served by the Indian Health Service] assistance with voter registration."  *See September Fact Sheet*, *supra*.  DOJ, to implement section 9 of EO 14019, intends to provide voter registration to federal prisoners.  *See* Attorney General Merrick B. Garland, Attorney General Merrick B. Garland Delivered a Policy Address Regarding Voting Rights (June 11, 2021).[12]  And HUD provided that PHAs could use certain funds to pay for voter registration activities.  *See* HUD Multifamily Announcement, *supra*.

208.    Indeed, any decision that an agency would provide voter registration services, outside of accepting State designations under the NVRA is a substantive rule that needs to go through notice-and-comment.

209.    On information and belief, numerous federal agencies—including Defendant Agencies and others—are doing just that and implementing EO 14019 by engaging in voter registration activities.

210.    On information and belief, many actions agencies have taken under EO 14019 constitute reversals of agency positions or amends regulations.  Those actions needed to have been done via notice-and-comment procedures, but they were not.

---

[12] *Available at* https://www.justice.gov/opa/speech/attorney-general-merrick-b-garland-delivered-policy-address-regarding-voting-rights.

211.    There is no constitutional or other statute provision that would permit the President to allow agencies to bypass procedural requirements to promulgate rules.

212.    For that reason, EO 14019, and the agency actions taken to implement them, are unlawful and *ultra vires* as they needed to be promulgated consistent with public notice-and-comment procedures.

213.    This Court has inherent authority to declare, enjoin, restrain, enter judgment, and impose penalties on Defendants and other federal actors, and those acting in concert with them, to prevent and restrain violations of law, including for *ultra vires* actions.

## PRAYER FOR RELIEF

Plaintiff States respectfully request that the Court enter judgment in their favor and grant the following relief:

A.    Declare that EO 14019, in whole or in part, is unlawful and unconstitutional;

B.    Declare that agency actions implementing EO 14019 are unlawful and unconstitutional;

C.    Vacate and set aside all agency actions implementing EO 14019;

D.    Enjoin all agency actions implementing EO 14019; and

E.    Grant any other relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff States demand a jury trial on all issues triable under Federal Rule of Civil Procedure 38.

Dated: August 13, 2024

Respectfully submitted,

**KRIS KOBACH**
**Kansas Attorney General**

*/s/ James Rodriguez*
JAMES RODRIGUEZ
  *Assistant Attorney General*
Kansas Bar #29172
ABHISHEK S. KAMBLI
  *Deputy Attorney General*
Kansas Bar #29788
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612
Phone: (785) 368-8197
E-mail: Jay.Rodriguez@ag.ks.gov
E-mail:  Abhishek.Kambli@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

**MARTY J. JACKLEY**
**South Dakota Attorney General**
**MONAE L. JOHNSON**
**South Dakota Secretary of State**

*/s/ Thomas J. Deadrick*
THOMAS J. DEADRICK*
  *Deputy Secretary of State*
  *Special Assistant Attorney General*
500 E. Capitol Avenue, Suite 204
Pierre, SD 57501
Office (605) 773-3537
E-mail: tom.deadrick@state.sd.us

*Counsel for Plaintiff State of South Dakota*

**AUSTIN KNUDSEN**
**Montana Attorney General**

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN
  *Solicitor General*
Kansas Bar #25622
PETER M. TORSTENSEN, JR.*
  *Deputy Solicitor General*
Montana Attorney General's Office
Office of the Attorney General
215 North Sanders
Helena, MT 59620
Office:  (406) 444-2026
E-mail: christian.corrigan@mt.gov
E-mail: peter.torstensen@mt.gov

*Counsel for Plaintiff State of Montana*

**BRENNA BIRD**
**Iowa Attorney General**

*/s/ Eric H. Wessan*
ERIC H. WESSAN*
  *Solicitor General*
1305 E. Walnut Street
Des Moines, IA 50319
Office:  (515) 823-9117
Fax:  (515) 281-4209
E-mail: eric.wessan@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

**MICHAEL T. HILGERS**
**Nebraska Attorney General**

*/s/ Grant D. Strobl*
GRANT D. STROBL*
  *Assistant Solicitor General*
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509
Office:  (402) 471-2683
E-mail:  grant.strobl@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

**LYNN FITCH**
**Mississippi Attorney General**
**MICHAEL WATSON**
**Mississippi Secretary of State**

*/s/ Whitney H. Lipscomb*
WHITNEY H. LIPSCOMB*
  *Deputy Attorney General*
Office of the Attorney General
P. O. Box 220
Jackson, MS  39205-0220
Office: (601) 359-3817
E-mail:  Whitney.Lipscomb@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*


**ALAN WILSON**
**South Carolina Attorney General**

*/s/ J. Emory Smith, Jr.*
J. EMORY SMITH, JR.*
  *Deputy Solicitor General*
Office of the Attorney General
Post Office Box 11549
Columbia, SC 29211
Phone: (803) 734-3642
Fax: (803) 734-3677
Email:  esmith@scag.gov

*Counsel for Plaintiff State of South Carolina*


**DREW H. WRIGLEY**
**North Dakota Attorney General**

*/s/ Philip Axt*
PHILIP AXT*
  *Solicitor General*
Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck, ND 58505
Phone: (701) 328-2210
E-mail:  pjaxt@nd.gov

*Counsel for Plaintiff State of North Dakota*


**GENTNER DRUMMOND**
**Oklahoma Attorney General**

*/s/ Gary M. Gaskins, II*
GARRY M. GASKINS, II*
  *Solicitor General*
ZACH WEST*
  *Director of Special Litigation*
Office of Attorney General
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
E-mail:  Garry.Gaskins@oag.ok.gov
E-mail:  Zach.West@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*

*\*PHV Application Forthcoming*